IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 1, 2009 Session

## STATE OF TENNESSEE v. KELVIN REED

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-05352     W. Mark Ward, Judge**

**No. W2009-00589-CCA-R3-CD  - Filed November 10, 2010**

Following a jury trial, Defendant, Kelvin Reed, was convicted of first degree premeditated murder, felony murder, and aggravated burglary. The trial court merged the offenses of first-degree murder and felony murder, and Defendant was sentenced to serve concurrent sentences of life imprisonment for his murder conviction and three years for aggravated burglary. On appeal, Defendant argues that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in admitting certain evidence, including testimony about the music played at Defendant's birthday party, testimony that one witness had seen Defendant with a gun, and photographs of the victim;  and (3) that the judgment for aggravated burglary should be corrected to reflect Defendant's actual sentence. Following review, we affirm the convictions and remand to the trial court solely for entry of a corrected amended judgment for aggravated burglary in accordance with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Affirmed in Part and Remanded in Part**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Brooks, Memphis, Tennessee (on appeal); and Robert Wilson Jones, District Public Defender; Michael J. Johnson, Assistant Public Defender; Amy Mayne, Assistant Public Defender; and Phyllis Aluko, Assistant Public Defender, Memphis, Tennessee (at trial) for the appellant, Kelvin Reed.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Patience Branham, Assistant District Attorney General; and Jeff Jones, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I.       Background

The victim, Dorothy Jamison, and Defendant had lived together for several years according to the victim's sister Sandra Townsell.  Ms. Townsell testified that during the summer of 2006, her sister had not appeared happy in her relationship with Defendant.  In July, 2006, Ms. Townsell attended a birthday party for Defendant at the residence shared by Defendant, Ms. Jamison, and Ms. Jamison's nine-year-old daughter, Tyresha, and nineteen-year-old son, Isiah.  Ms. Townsell observed that there were more women than men at the party, and she testified that she saw Defendant dancing with women other than the victim.  After the party, Defendant left with his friends.  Ms. Townsell and other witnesses testified that Defendant was known as "Teddy."

Vanessa Hudson, a friend of the victim, who also attended  Defendant's birthday party, testified that Defendant was playing music and singing along to songs with lyrics about having more than one girlfriend at the same time.  Sandra Townsell's husband, Donald Lewis, testified that Defendant told him at the party that he had another girlfriend besides the victim.

Following the birthday party, the victim and her children moved out of Defendant's residence and lived with Ms. Hudson briefly before moving into Mrs. Townsell's home, where they lived from August, 2006, until October, 2006.  The victim and her daughter then moved into an apartment at Cedar Mills Apartments in Memphis.  Ms. Hudson, Ms. Townsell, and Mr. Lewis all testified that while the victim was living with them, Defendant would call the victim's cell phone frequently and visit their homes to speak with the victim, but the victim never allowed Defendant into the home.

Ms. Hudson testified that she had seen Defendant with a gun on several occasions, and on one occasion, she had gone to Defendant's residence with the victim to retrieve some of the victim's belongings, and she saw Defendant holding a black handgun to his head.  The victim's son, Isiah Jamison, also testified that Defendant owned a gun.  He further testified that following an argument between himself and Defendant in July, 2006, he and his mother and sister left Defendant's residence and stayed that night in a hotel, and they never returned to live with Defendant.

In the early morning hours of November 5, 2006, the victim and her daughter returned home from Vanessa Hudson's house.  The victim's nine-year-old daughter had fallen asleep in her mother's bed and was later awakened by "hollering" between her mother and a man, whom she identified as Defendant, wearing black pants and a black coat.  She testified that

she saw her mother and Defendant standing in the hallway, and Defendant had his arm around her mother's neck with a gun pointed at her. She further testified that she saw Defendant drag her mother to the kitchen. The victim's daughter testified that the only light was from the television in the bedroom. She testified that after she heard Defendant leave, she got out of bed and found her mother lying in the kitchen floor. She also testified that she had not seen Defendant inside their apartment before that night.

In the first 911 call, made by the victim, a female voice is heard screaming and several gunshots are also heard. The voice says repeatedly, "Please, Teddy, please!" A second 911 call was made by the victim's daughter, who stated that her mother had just been killed by her boyfriend.

Barbara Javer, a sergeant with the Memphis Police Department, responded to a call to the victim's apartment. She testified that upon entering the apartment, she observed evidence of a fight. There was a broken chair in the living room. She found Ms. Jamison lying in a pool of blood near the back door in the kitchen. The victim appeared to have four gunshot wounds, one to her back, one to her upper left arm, and two to her left shoulder. There were blood smears and gunshot damage in the hallway and on the walls. Sergeant Javer spoke to the victim's daughter. She testified that based on her interview with the victim's daughter, she developed Defendant as a suspect.

Officer Michael Hill of the Memphis Police Department also responded to the victim's residence, and he testified that the front door to the apartment appeared to have been forced open, there was damage to the walls and blood on the walls, and several bullet fragments and spent casings from a .40 caliber handgun were found in the hallway. Officer Hill took photographs, collected evidence, and made a sketch of the crime scene. Officer Hill did not collect any fingerprint evidence.

Sergeant Anthony Mullins, certified in bloodstain pattern analysis, examined the photographs taken by Officer Hill, and concluded that the blood found in the victim's apartment was transferred from the victim while the victim was still bleeding and moving through the apartment. Sergeant Mullins also saw evidence of impact spatter and cast off bloodstains, indicating that the victim had been hit with something while bleeding, and swiped bloodstains, indicating that someone or something brushed across the blood that was transferred onto the walls by the victim. He testified, based on the photographs of the victim's body and clothing, that the victim had been moved after she fell to the floor.

Sergeant William Merritt testified that he interviewed the victim's daughter and then obtained a warrant for Defendant's arrest. Defendant turned himself in to authorities. Sergeant Merritt testified that another officer observed that Valerie Hamer brought

Defendant to the police station. The officer followed Ms. Hamer to her residence and found a 1989 Mercedes registered to Defendant. The car was impounded and taken to the crime scene office.

Former Memphis Police homicide detective Thomas Helldorfer executed a search warrant on Defendant's black Mercedes. He found what appeared to be blood on the driver's side exterior door handle and the interior of the vehicle. He also found Defendant's employee I.D., bearing the name "Teddy Reed" in the console of the vehicle. Officer Ricky Davison collected samples of the bloodstains found in the car.

Lawrence James, a forensic scientist with the Tennessee Bureau of Investigation, performed DNA analysis on the samples collected from Defendant's car and compared those samples to known standards from Defendant and the victim. He determined that the DNA from the blood samples collected from the outside of the car door and the inside of the car matched the victim's DNA. He was unable to get a DNA profile from the sample collected from the driver's side armrest. He also analyzed the victim's fingernail scrapings and found no evidence of another person's DNA.

Sergeant Merritt also obtained Defendant's and the victim's cell phone records. There were 57 calls from Defendant's cell phone number to the victim's cell phone number in the 24-hour period prior to the victim's death. The last call to the victim, which lasted 27 minutes, was placed at 2:27 a.m. on November 5, 2006. At 2:46 a.m., there was a call to Defendant's cell phone from Deborah Hollowell. That call lasted only 28 seconds, indicating that it probably went to voicemail. The signal used to receive that call was from a cell tower located one-half mile from the victim's apartment.

Charity Wright, the custodian of records for Cricket Communications, also testified about Defendant's cell phone usage around the time of the victim's death. She counted 56 calls from Defendant's cell phone to the victim's cell phone, with the last one having been made at 2:27 a.m. on November 5, 2006, and lasting 27 minutes. She also confirmed that the call made to Defendant's cell phone at 2:46 a.m. was received using a cell tower located within close proximity to the victim's apartment.

Dr. Lisa Funte, a forensic medical examiner for Shelby County, performed an autopsy on the victim's body and concluded that the victim died from multiple gunshot wounds to her head, chest, and shoulder. Dr. Funte determined that the fatal gunshot wound was to the victim's chest, which fractured a rib and perforated her left lung. Dr. Funte noted that there was no powder residue or burning on the victim's clothing, indicated that the shots were fired from at least three or four feet away. She recovered a bullet and bullet fragments from the victim's body.

Defendant did not testify or present any proof at trial.

## II.    Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his convictions. Specifically, Defendant contends that the evidence is insufficient to prove his identity as the perpetrator.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Defendant specifically argues that the evidence is insufficient to prove his identity as the perpetrator of the crimes. The identity of the perpetrator is an essential element of any crime. *See State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). Sufficient proof of the perpetrator's identity may be established through circumstantial evidence alone. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). In such cases, however, the facts must be "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" *Id.* (quoting *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993)). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958) (citations omitted).

The defendant argues that the victim's daughter's identification of the defendant is "questionable at best" and that she referred to him by a "common nickname, Teddy" only.

Defendant further contends that the evidence in this case is entirely circumstantial. The State responds that there is both direct and circumstantial proof sufficient to establish the defendant's guilt.

The victim's daughter testified that she awoke from her sleep and heard the defendant and her mother "hollering." She saw her mother and Defendant, whom she called "Teddy," standing in the hallway, Defendant with "his arm around her neck and [ ] the gun pointed" at her mother. She testified that Defendant shot her mother and then dragged her body into the kitchen. On the 911 calls, a female voice can be heard screaming, "Please, Teddy, please," and the sound of several gunshots is heard. In a call to 911 by the victim's daughter, she identifies her mother's killer as her mother's boyfriend. The victim's daughter identified the voices heard on the 911 call recording as her mother's, the defendant's, and hers.

The victim's daughter was unequivocal in her identification of the defendant as the person who shot and killed her mother. She testified as follows:

> Q. And did you tell the police who did those things to your mom?
> A. Yes, ma'am.
> Q. And who did you say shot your mom?
> A. Kelvin Reed.
> Q. Okay. And you call him Teddy, right?
> A. Yes, ma'am.
>
> ****
>
> Q. [T.S.], when [defense counsel] kept referring to "that man" like it was someone you didn't know, did you know who was in your apartment?
> A. Yes, ma'am.
> Q. Could you see him?
> A. Yes, ma'am.
> Q. Could you hear him?
> A. Yes, ma'am.
> Q. And who was it that was in the apartment?
> A. Kelvin.
> Q. Kelvin?
> A. Yes, ma'am.
> Q. And you told the police that didn't you?
> A. Yes, ma'am.

-6-

The defendant's employee identification badge taken by police from his car had the name "Teddy Reed" and the defendant had the name Teddy tattooed on his forearm. The victim's daughter's testimony was corroborated by the evidence collected and observed at the crime scene. The blood spatters and smears in the hallway, spent casings, and bullet hole damage to the walls indicate that the victim was shot in the hallway and dragged to the kitchen, as her daughter recounted. Investigating officers found evidence of a struggle at the victim's apartment, and the front door had been "forced open" and the door jamb was broken.

Moreover, the victim's blood was found in and on the defendant's vehicle. Defendant's cell phone records established that he made 56 or 57 outgoing calls to the victim in the 24 hours prior to her death and that the defendant was within one half a mile from the victim's apartment shortly before the 911 call was made. Defendant's challenge to the sufficiency of the convicting evidence is without merit.

## III. Admissibility of Evidence

Defendant challenges the admissibility of (1) testimony about the music played at the defendant's birthday party; (2) testimony that the defendant possessed a gun; and (3) photographs taken of the victim's body at the crime scene.

Questions as to the admission of evidence generally lie within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999). When employing this standard, the lower court's decision should not be disturbed unless the lower court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injury to the party complaining." *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002) (citations omitted).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Evidence is deemed relevant under Rule 401 if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000). This court has stated "the trial court is entitled to draw upon common sense, general knowledge, and its understanding of human conduct and motivation in assessing whether certain evidence could reasonably affect an assessment of the probability of the fact to be inferred." *State v. Hayes*, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995).

Only after the court finds that the proffered evidence is relevant does the court then weigh the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. If the court, in its discretionary authority, finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...."). Clearly, Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. *See Roy v. Diamond*, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999). "Thus, excluding relevant evidence under [this rule] is an extraordinary remedy that should be used sparingly, and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted).

### A. Testimony about the music played at Defendant's birthday party

The defendant asserts that the trial court erred by allowing Vanessa Hudson to testify about the music that Defendant played at his birthday party. Ms. Hudson testified, "[Defendant] was playing a lot of blues music that was pertaining to him having the woman in one room and another woman in another room...." Over Defendant's objection, the trial court ruled in a jury-out hearing after further inquiry that Ms. Hudson's testimony was relevant:

> THE COURT: We just had testimony about [Defendant] telling someone that he had other women there that he's doing and if this music is on and then we're talking about how the victim interpreted this and how she became upset and moved out, I do find it relevant. But I want [the witness] to explain it in terms that it's clear for this jury what was – what she's trying to say and not ambiguous. And I think the way she's explained it is very ambiguous.

During the jury-out hearing, the court allowed the State to question the witness further and established some guidelines for her testimony. Ms. Hudson testified in the presence of the jury as follows:

> Some of [the songs] were sensual, sexual songs. But they were mostly all blues songs. He played rap songs. And a lot of them were, you know, vulgar and about sex, you know, about women and about men, you know, togetherness and things that men and women do in sexual ways. And he was singing and rapping those songs for his party and for the group in his DJ room in his house.

The State contends that this testimony, taken with other evidence at trial that Defendant may have been seeing other women, that the victim was upset by this and subsequently moved out of Defendant's residence, and Defendant continued to try to contact the victim, was relevant to establish the State's theory of premeditated murder and that Defendant's actions at the birthday party were probative of his intent and motive for killing the victim.

Defendant asserts that the trial court allowed Ms. Hudson "to continually ascribe to the defendant the actions of characters in songs he played regarding men having more than one paramour." We disagree. During a jury out hearing, the trial court admonished the witness to avoid making any connection between the defendant and the actions being described in the lyrics of the songs played at the party, repeatedly instructing the witness not to refer to "him" when describing the actions of the character in the songs. The court had the following exchange with the witness:

> THE COURT: All right. How many times – let me see if I can make this clear. How many times – this song, whatever the name of it was – mentioned [Defendant]'s name?
>
> THE WITNESS: It never mentioned [Defendant].
>
> THE COURT: Okay. Then obviously when you're talking about this song, I don't want you to mention [Defendant]'s name because it was nowhere in the song, right? Could you just explain to the jury that there was a song about "a" man having more than one person in the room that – but you kept saying the word "him" and I can understand why the defense would object to that because you're making it sound like he was playing a song about himself.

In our view, the trial court did not abuse its discretion by allowing the witness to testify about the songs she heard at Defendant's party. This and other testimony about Defendant's conduct at the party does have a tendency to show that the relationship between the Defendant and the victim was strained and was relevant to the issue of Defendant's motive and intent. A review of the record does not demonstrate that the prejudicial effect from this testimony outweighed its probative value. Defendant's assertion that the trial court erred on this issue is without merit.

*B. Evidence of Defendant's prior possession of a gun*

Defendant contends that the trial court erred by allowing Isiah Jamison, the victim's son, to testify that the defendant owned a gun prior to the murder. The State argues that Defendant's ownership of a gun, the same type of weapon used to commit the murder, is relevant to a "fact...of consequence" at trial. Mr. Jamison testified the defendant had owned a gun and that he had not had any contact with Defendant since July, 2006, when they moved out of Defendant's residence.

The trial court overruled defense counsel's objection to this testimony, ruling as follows:

> THE COURT: Well, I disagree. The same analysis applies. Owning a weapon is not a crime. There's no proof of other crimes involved in this. The question is, is there any relevancy whatsoever to the fact that he owned and had access to a weapon when this killing was committed by a weapon. And grant you, it may not be, you know, overwhelmingly relevant, but I do believe it has some relevancy in this matter. And of course, the relevancy gets weaker the further it gets away from the shooting. I agree with you on that. But the problem is, there is no prejudice to owning a – or very remote prejudice to owning a weapon. It's not a crime to own a weapon. And it does show that he had the means, the capability and the access at some point by having a weapon.

Applying the same principles governing relevant evidence, we agree with the trial court. The proof at trial established that the victim was killed by a .40 caliber gun. Although Mr. Jamison gave no description of the gun owned by Defendant, testifying only that Defendant had owned a gun prior to the murder, the trial court properly concluded that such evidence was relevant to establish the Defendant's means to commit the crime. Further, the probative value of the testimony about the gun was not outweighed by its prejudicial effect. Another witness, Vanessa Hudson, testified, without any objection as to relevance by the defense, that she had seen the defendant with a gun on "several" occasions, and on one occasion, Defendant held the gun to his head, which frightened the victim. This issue is without merit.

## C. *Photographs of the victim's body at the crime scene*

Defendant contends that the trial court erred in admitting five photographs taken of the victim's body at the crime scene. The State argues that the photographs were necessary to corroborate the testimony of the victim's daughter, the only eyewitness, and to establish the Defendant's identity as the perpetrator.

The trial court considered the arguments of counsel and weighed "the danger of any unfair prejudice or cumulative nature of the evidence" and overruled defense counsel's objection to the photographs, finding that the photographs were not "particularly gruesome" and were "probative to the state's case" as it relates to the other evidence of blood splatters and smears and as corroborative of the victim's daughter's testimony.

The admissibility of photographs lies within the sound discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *State v. Lacy*, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). Nevertheless, the photograph must be relevant to an issue at trial with its probative value outweighing any prejudicial effect that it may have upon the trier of fact. *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

The leading case regarding the admissibility of photographs is *State v. Banks*, 564 S.W.2d 947 (Tenn. 1978), in which the supreme court held that the admissibility of photographs of murder victims is within the discretion of the trial court after considering the relevance, probative value, and potential unfair prejudicial effect of such evidence. Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Id*. at 950-51. The probative value of the evidence must be weighed against any unfair prejudice the defendant will suffer in admitting the evidence, and only if the unfair prejudice substantially outweighs the probative value may the evidence be excluded. *Id*. at 951.

As discussed above, evidence is relevant when it has any tendency to establish a fact, bearing on the outcome of the action, as more or less probable than without that evidence. Tenn. R. Evid. 401. Specifically, evidence can be relevant if it aids the testimony of an investigative officer or medical examiner. *See State v. Bush*, 942 S.W.2d 489, 515 (Tenn. 1997). In the present case, the photographs were introduced as exhibits to Officer Hill's testimony and used to supplement the testimony of Sergeant Mullins, the State's bloodstain expert.

The photographs of the victim taken at the crime scene depict blood spatters and smears of blood on the victim's clothing and the floor around the victim, which Sergeant Mullins testified indicated that the victim had been moved. This evidence is consistent with the testimony of the victim's daughter that Defendant dragged her mother to the kitchen after he shot her.

There were also several autopsy photographs, depicting the victim's wounds, admitted into evidence without any objection by defense counsel. We note that the probative value of these photographs and the challenged photographs is somewhat diminished by the

abundance of other evidence in this case. Sergeant Javer testified that upon entering the victim's apartment, she observed the victim lying in a pool of blood in the kitchen floor, and she saw blood smears down the hallway. She also testified as to the location of the victim's gunshot wounds. The medical examiner also testified as to the location of the victim's wounds. We find no error, however, in the trial court's admitting into evidence either set of photographs.

This court held in *State v. McCall*, 698 S.W.2d 643, 648 (Tenn. Crim. App. 1985), that a photograph of the victim's wounds after his body was cleaned from its "bloody and gory condition" was admissible. The autopsy photographs in the present case do not show the victim's body in a bloody or gory condition. While the crime scene photographs do show the victim's body in a bloody condition, we agree with the trial court that these photographs are not particularly gruesome and their probative value outweighs any prejudicial effect. A contested issue at trial was the Defendant's identity as the perpetrator. The photographs were relevant to corroborate the eyewitness testimony. This issue is without merit.

## IV.    Correction of judgment

Defendant asserts that the judgment entered by the trial court is incorrect as to the defendant's sentence for aggravated burglary. At the conclusion of the trial in this matter, in lieu of a sentencing hearing, the State offered the minimum sentence of three years for Defendant's aggravated burglary conviction, to be served concurrently with a life sentence for his conviction for the merged offenses of first-degree murder and felony murder. Defendant agreed to the proposed sentence, and the trial court stated:

> All right.  Mr. Reed, the only possible punishment for your two murder counts is life imprisonment.  So I'm going to sentence you to life in prison on count one.  I'm going to sentence you to life in prison on count two.  I'm going to sentence you to the minimum sentence on the aggravated burglary three years.  And those sentences will be served concurrently or at the same time for effective sentence of life in prison.

The judgment form entered by the trial court incorrectly shows that Defendant was sentenced to life imprisonment for his aggravated burglary conviction. This case is remanded to the trial court for entry of a corrected judgment showing Defendant's sentence for his conviction for aggravated burglary as three years to be served concurrently with his life sentence for the merged offenses of first-degree murder and felony murder.

## CONCLUSION

After a thorough review of the record before us, we affirm Defendant's convictions for aggravated burglary and the merged offenses of first-degree murder and felony murder. This case is remanded, however, to the trial court for entry of a corrected judgment to accurately reflect Defendant's sentence of three years for his aggravated burglary conviction.

_____
THOMAS T. WOODALL, JUDGE